## FIDELITY & CASUALTY CO. OF NEW YORK v. GORMAN.
### No. 8511.

Circuit Court of Appeals, Eighth Circuit.
Feb. 11, 1930.
Rehearing Denied March 12, 1930.

Wayne Ely, of St. Louis, Mo., for appellant.

James J. O'Donohoe and Henry E. Haas, both of St. Louis, Mo., for appellee.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and DEWEY, District Judge.

VAN VALKENBURGH, Circuit Judge.

Appellee is the widow of one J. P. Gorman and beneficiary in a certain accident policy originally issued by the Fidelity & Casualty Company of New York on the 1st day of February, 1925. The policy was in the principal sum of $5,000, to be paid to the beneficiary in case of death by accident while the policy was in force. The term of the policy was for one year, with the provision that, "at the expiration of the term for which this policy is issued, and at the expiration of any term for which it may be renewed, the company will, subject to all the provisions and limitations therein contained, renew the policy for a similar term in consideration of the premium for the renewed term; provided that the assured, upon the date the said renewal takes effect is in sound condition, mentally and physically, except as stated in the application for this policy, and is not over sixty-five years of age, and that the policy has not terminated or been cancelled prior to the said date."

The last renewal of the policy was for the period from noon of the 1st day of February, 1926, to noon of the 1st day of February, 1927. January 1, 1927, the insured fell upon the front steps of his home and suffered a fracture of the left fibula, a dislocated ankle, and a fracture of the astragalus or proximal bone of his left foot. He was removed to a hospital and the injured leg placed in a cast. He remained in the hospital for about three weeks, but his leg remained in the cast until the latter part of March or first of April. Upon leaving the hospital he did not return to his home, but went to the Missouri Hotel at Eleventh and Locust streets in St. Louis. This hotel was but a short distance from the Rice-Stix Dry Goods Company, of whose silk department the assured was manager. In order to be in closer communication with the dry goods company, he remained at the Missouri Hotel from January 22, 1927, until his death April 15, 1927.

January 26, 1927, Gorman made application for a renewal of his accident policy expiring February 1, 1927. In this application he stated: "I am in sound condition mentally and physically except as follows: Fracture of ankle and left leg."

The company replied, declining to renew the policy until recovery from his accident

and his resulting sound condition should justify renewal. At the time of making his application, he sent appellant a check for the renewal of this insurance, but the check was returned. Thereafter he received a check for his claim of accident in the sum of about $550. So far as the record shows, he acquiesced in the refusal of the company to renew his insurance, and made no further application for renewal. The policy accordingly by its terms expired February 1, 1927.

April 14, 1927, a fire occurred in Mr. Gorman's room at the Missouri Hotel. As to the origin of the fire, his daughter at the trial testified as follows: "Daddy said that he had been reading and smoking, and that he fell asleep, and that the fire occurred, and that he guessed or he supposed that the cigarette fell from his hand and ignited the carpet or the bed on the front, and caused the fire but he did not know positively."

At any rate, for some reason he was unable to escape from the room, and, when removed by others, was so badly burned that he died the following day, April 15, 1927. Appellee brought suit to recover upon the policy, treating it as still in force. The jury returned a verdict in her favor in the sum of $8,603.69, and judgment was entered accordingly.

The theory of the plaintiff, which theory was adopted by the court, is:

1. "The provision in the policy, to-wit, that, 'At the expiration of the term for which this policy is issued, and at the expiration of any term for which it may be renewed, the company will, subject to all the provisions and limitations therein contained, renew the policy for a similar term in consideration of the premium for the renewed term,' was an absolute legal obligation on the part of the company and could not be avoided without adequate cause, since the word 'will' has a mandatory signification and excludes the idea of discretion."

2. "The words 'sound condition, mentally and physically,' as used in the policy, do not mean a mere temporary indisposition, ailment or injury, but these words mean the absence of any vice in the constitution, and of any mental or physical disease or injury of a serious nature that has a direct tendency to shorten life."

The remedy ordinarily would be an action for breach of contract to renew, in which, if the refusal to renew was wrongful, the beneficiary may recover as damages the amount which she would have been entitled to under the policy if the renewal had been made as agreed. 32 C. J. 1146, 1149. But counsel for plaintiff have evidently assumed that the renewal clause in the policy operated automatically to renew, and have elected to treat the policy as in force and wrongfully repudiated. In such proper case the beneficiary may await the event upon which the policy becomes payable, and, after the death of the insured, may sue for the amount payable under the policy. 32 C. J. 1264.

But we do not think there is here presented a case of cancellation or repudiation of a policy in force at the date of the accident which caused the death of the insured. The policy expired by its terms February 1, 1927, unless renewed on or before that date. It contained a clause expressly agreeing to renew it under conditions therein stated. Upon application by Gorman, made January 26, 1927, renewal was refused by the company, or at least postponed until the insured should so far recover from his accident suffered January 1, 1927, as to present the sound physical condition stipulated. In this decision of the company the insured apparently acquiesced. At least that decision was not protested, and no further application was made. We have not here presented the case of a policy which has been canceled or repudiated, and which the insured or his beneficiary may elect to treat as still in force; but rather the alleged breach of an agreement to renew. In the absence of renewal, the policy expired February 1, 1927. Plaintiff has sued upon that policy. We think she has mistaken her remedy, and should have brought an action in damages for breach of contract to renew. But we do not find it necessary to base our decision upon that ground.

Reduced to their final analysis, the assignments of error challenge the charge of the court to the effect that "the words 'sound condition, mentally and physically,' as used in the policy, do not mean a mere temporary indisposition, ailment or injury, but these words mean the absence of any vice in the constitution, and of any mental or physical disease or injury of a serious nature that has a direct tendency to shorten life."

This would exclude the admitted condition of Gorman's leg as such an unsound physical condition as would justify appellant's refusal to renew the policy; and this is, in fact, the only substantial question involved in this appeal.

It is conceded that, under the terms of the renewal clause, if the insured was not in sound physical condition at the expiration

of the term for which the policy might be renewed, no obligation to renew rested upon appellant. It is necessary, then, to determine (1) what the physical condition was on the 1st day of February, 1927, and (2) whether that condition was sound or unsound within the meaning of the renewal contract. The accident to the insured on January 1, 1927, his confinement in hospital, and his subsequent removal to the Missouri Hotel, situated near his place of business, have already been stated. March 17, 1927, he made a statement to the company in which he recited the nature of his injuries as above described, and stated that he had been continuously and totally disabled, as the direct result of these injuries, from December 31, 1926, to date of statement; that during that period he had been continuously confined to the house and was still so confined. March 16, 1927, the attending physician certified to the company that he had attended the insured from January 1, 1927, to March 16, 1927, and that his patient was still disabled. April 26, 1927, the beneficiary, in support of her claim, stated to the company that her husband had been continuously and totally disabled for a period of 104 days from December 31, 1926, to April 15, 1927, the date of his death, and that he had never resumed work after his accident on January 1st. Mr. Wasserman, Gorman's assistant, and a witness for plaintiff, testified that the insured began to get around on crutches about the 1st of March. Respecting subsequent visits to the store, he said:

"Q. Mr. Wasserman, when was it that you said Mr. Gorman first began making trips over to the store from the hotel? A. Well, I did not keep any record.

"Q. I know—about when? A. I would say it would be about the last of March to the early part of April, along there.

"Q. Until that time, you called on him in his room in the hotel for any business you had to transact with him? A. I did. I was gone on a business trip to New York for about ten days, I believe, during March, is my recollection.

"Q. Did he discard his crutches before he started over to the store? A. Before he went over to the store? No, sir; he came over to the store with his crutches; that is, he walked over there on crutches.

"Q. You said one of the men would go over and get him and bring him over to the store? A. Yes, sir.

"Q. That was the cause, of course, he could not walk along the street as a normal

person could walk, wasn't it? A. Well, naturally, it was bad weather, slippery, icy."

William Sommers, another employee of the Rice-Stix Company, and a witness for plaintiff, testified as follows concerning Mr. Gorman's occasional visits to the store during the last three weeks of his life:

"Of course, not being a young fellow, he was a little bit timid in using his crutches; so I says, 'Well, if you come over,' I says 'you can get one of the boys, one of the colored boys down at the hotel to walk over with you, to see that nothing happens crossing the streets;' and he was very careful, although he was a little bit afraid. So Monday morning of the following week, he was ready to come to the store, and he called me, and he says, 'Bill, maybe you better come over and get me, because I don't like to trust these darkies around the hotel; they may not pay as close attention to me;' so I said, 'All right, I will come over and get you.' "

On these occasions, the witness said, "he may stay there an hour, he might stay there two hours."

From the foregoing, the physical condition of the insured for the period between January 1, 1927, until his death, April 15, 1927, is clearly disclosed. He was sixty-one years of age.

The assigned errors of which appellant complains are embraced in the charge of the court upon "sound condition mentally and physically," to which exception was duly taken. The court said:

"Now, if you believe from the evidence that on or about the fourteenth of April, 1927, at the Missouri Hotel, in the City of St. Louis, J. P. Gorman sustained bodily injuries through accidental means, by being parched or burned through a fire, and that he died on or about the fifteenth of April, 1927, as a direct result of said injuries, and independently and exclusively of all other causes, then your verdict should be for the plaintiff, provided you further find from the evidence that J. P. Gorman, the insured, on or prior to the first of February, 1927, tendered to the defendant the sum of forty-five dollars for a renewal premium for the year commencing the first of February, 1927, and ending the first of February, 1928, and provided you further find from the evidence that on or about the first of February, 1927, J. P. Gorman, the insured, was in sound condition, mentally and physically, and was not at said time over the age of sixty-five years. * * *

"The words 'Sound condition, mentally and physically', as used in the policy, do not mean a mere temporary indisposition, ailment, or injury, but these words mean the absence of any vice in the constitution, and of any mental or physical disease or injury of a serious nature that has a direct tendency to shorten life."

Later, on the same day, the jury asked the court to define again the words "sound condition, mentally and physically." The court repeated from its charge the clause last above quoted, and added:

"Now, in this case, Mr. Gorman concededly had a broken limb, and you know from the testimony what his condition was on the twenty-sixth of January, 1927, when he applied to renew this insurance policy. Now, if you think that this disability that he had, whatever you believe he did have, if you think that that was just temporary indisposition or ailment, or temporary injury, why then he was in sound condition, mentally and physically. On the other hand, if you believe that his condition at that time was such that he had a physical disability, or had an injury of a serious nature, that had a tendency to shorten his life, why then he was not in sound, mental and physical condition. That is as much as I can tell you about it. You may retire, Gentlemen."

Counsel for appellee have cited many cases in support of their contention that accident policies are governed by the same general rules of construction as life policies, and that, with respect to life policies, the words, "sound physical condition" have the meaning as defined by the court. This contention must be received with some reservation. The cases cited must be read and applied with reference to the facts with which they deal. Analysis of any considerable number would unduly extend the length of this opinion without corresponding profit. We shall advert to some of those most prominently cited.

In Logan v. Fidelity & Casualty Co., 146 Mo. 114, 47 S. W. 948, 950, the defense of suicide was interposed, and it was held that section 5855, R. S. Mo. 1889, declaring that suicide shall be no defense in a suit on a policy providing for payment of so much money in case of death, unless the insured contemplated suicide at the time of making application for the policy, applied to accident policies, although that statute was found in the chapter entitled "Life Insurance." The court said: "The real object of the section, as the clear terms of its language express,

is to affect all policies of insurance on life, from whatever class, department, or line of insurance the policy may be issued, or by whatever name or designation the company may be known."

Whitfield v. Ætna Life Insurance Co., 205 U. S. 489, 27 S. Ct. 578, 51 L. Ed. 895, was a Missouri case involving the defense of suicide, and the Supreme Court followed the rule announced in Logan v. Fidelity & Casualty Co., supra.

In Continental Casualty Co. v. Agee, 3 F.(2d) 978, 979, this court, under similar circumstances, held as follows: "An insurance company, which may be properly called an accident insurance company, because such insurance is the main or characteristic form of insurance afforded by it, may also be a life insurance company, because it insures against the death of the insured, even though the scope of such insurance is somewhat limited."

In Northwestern Mutual Life Insurance Co. v. Wiggins (C. C. A. 9) 15 F.(2d) 646, plaintiff sought to cancel a life policy on account of alleged material false statements made by the insured as to the condition of his health. The burden was cast upon the insurance company to establish that, in making the statement challenged, the insured knew he had a disease which tended to weaken or undermine his constitution.

In Miller v. Maryland Casualty Co. (C. C. A. 3) 193 F. 343, a death case, defense was made to suit on the policy because of alleged misrepresentations made as to the health of the insured. It was held that a Pennsylvania statute applied, which provided that, when a life policy contains a warranty of the truth of answers contained in the application, no untrue statement made in good faith shall affect a forfeiture, unless the untrue statement relates to some matter material to the risk. Accident companies in their applications require statements as to the physical condition, past and present, of the applicant, because accident policies usually provide against death due solely to external accidental means. It is sought, therefore, to avoid, so far as possible, the confusion and uncertainty resulting from a combination of natural and accidental causes of death. In this respect accident policies partake of the nature of life policies, and are subject to the same rule respecting false statements in the application.

In Maryland Casualty Co. v. Gehrmann, 96 Md. 634, 54 A. 678, a case similar to the

preceding one, it is pointed out that whether misrepresentations or untrue statements contained in an application for accident insurance relate to some matter material to the risk is generally a question of fact for the jury.

The rule invoked by appellee, as gathered from text-books and decisions, may be thus generally expressed: "The general rules of construction used in the interpretation of other contracts are applicable to insurance contracts irrespective of the particular form of insurance evidenced by the contract." Cooley's Briefs on Insurance (2d Ed.) vol. 2, p. 967, clause b. "All policies which indemnify against death resulting from accidents are essentially life insurance policies, and as such are governed by statutes which control the issuance of policies of life insurance." Fuller on Accidents, etc., Insurance, p. 1. And "depend upon essentially the same principles as other kinds of insurance." American & English Encyc. of Law (2d Ed.) p. 285. They are "governed by the same general principles as other insurance. * * * So far as payment of premiums is concerned the general rules apply, but, as the contract is one from year to year, the contract in this respect resembles a policy of fire insurance." Bacon on Life and Accident Insurance (4th Ed.) vol. 2, par. 505. "The contract closely resembles that of life insurance." Joyce on the Law of Insurance (2d Ed.) vol. 1, p. 91, par. 8. "The truth of the matter is that accident insurance is analogous to all other kinds of insurance and is governed by the same general rules, although the character of the risk necessitates particular applications thereof, and certain special rules peculiar to this class of insurance." 1 C. J. 405.

The cases cited, and many others examined, deal principally with defenses involving deaths by suicide, and alleged misrepresentations as to health in applications for insurance. General rules of construction are held applicable. These refer to such matters as statutes governing the issuance of insurance policies; representations and warranties as to health made in applications to the company by the insured; rules concerning premiums, their payment and default; rules governing ambiguities, requiring liberal construction in favor of the insured; and, in case of uncertainty, strict construction against the party responsible for such uncertainty. These general rules apply to all forms of insurance, but no case brought to our attention has held that the standards

of eligibility and acceptability of applicants for life and accident insurance are identical. Life insurance is concerned only with such unsound physical conditions as tend to shorten life. Accident insurance, which includes indemnity in case of death, is likewise concerned with the same physical condition, but it also insures against minor accidents not resulting, nor tending to result, in death. With such, straight life companies are not concerned, at least after policy issued. The concern of the accident company is to eliminate any physical condition which may predispose to accident of any nature great or small. No physical condition which renders the insured more liable to accident is a sound physical condition from the standpoint of accident insurance. We think the language of this renewal clause should be read in the light of this obvious distinction between life and accident policies.

In Maryland Casualty Co. v. Finch, 147 F. 388, 8 L. R. A. (N. S.) 308, this court held that insurance contracts "like other contracts, are to be construed and applied according to the ordinary meaning of the terms employed, in consonance with their popular sense." To the same effect is Standard Life & Accident Insurance Co. v. McNulty (C. C. A. 8) 157 F. 224. The rule respecting ambiguity in an insurance contract "cannot be availed of to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, fundamental inquiry being intention of the parties, to be gathered from the words of the policy." Flannagan v. Provident Life & Accident Insurance Co. (C. C. A. 4) 22 F.(2d) 136. "If the terms of a policy of insurance are clear and unambiguous, they are to be taken in the plain, ordinary, and popular sense." Callen v. Massachusetts Protective Ass'n (C. C. A. 8) 24 F.(2d) 694.

We are of opinion that, upon the facts before us, the insured was not in sound physical condition within the meaning of the renewal clause of the policy in suit, that appellant was warranted in declining to renew his policy while that condition existed, and that the charge of the court upon this issue was erroneous. To us it seems inconceivable that a man in Mr. Gorman's condition on February 1, 1927, could be thought physically sound as a candidate for accident insurance, or for the renewal of a policy already existing. In this connection the opinion of Dr. Fleischman, a medical witness for plaintiff, is interesting:

"Q. Would you say that a man with a broken leg would be in sound physical condition for accident insurance? A. I would.

"Q. Why would you? A. Because a man who is fool enough to walk on a broken leg, or can walk on a broken leg, should be accepted by any insurance company, it makes no difference what kind.

"Q. I see. It makes no difference how fast or how slow he would walk, does it? A. The individual applying for insurance, with a broken leg, does not expect the insurance company to accept him at the time that he applies. If it was the, oh, first application, I have no doubt that he would not make it.

"Q. Why wouldn't he make it? A. It would be the height of human folly for a man who had never carried insurance, when he breaks his leg and it is still broken, to apply for insurance.

"Q. Why? A. It would be greater folly for the insurance company to even countenance it."

For the reasons stated, the judgment is reversed, and the case remanded for a new trial.