**PALATINE INS. CO., LIMITED, OF LONDON, ENGLAND, v. PETROVICH.
(No. 7338.)**

(Court of Civil Appeals of Texas. Galveston. March 26, 1917. Rehearing Denied Oct. 24, 1921. Dissenting Opinion Nov. 23, 1921.)

**1. Insurance ☞423—Tornado policy held not to cover loss caused partly by water.**

A tornado insurance policy, which expressly exempted the company against loss occasioned directly or indirectly through tidal wave, high water, or overflow, insures the property against damage by wind alone, and not against damage occasioned partly by wind and partly by high water.

*On Motion for Rehearing.*

**2. Insurance ☞665(4)—Evidence held not to sustain finding destruction of house was caused by wind.**

In an action on a tornado insurance policy, evidence which showed that the house insured collapsed only after the water had risen several feet above its floor *held* to show that the loss of the house was not occasioned by wind alone.

**3. Appeal and error ☞1010(1)—Finding is erroneous, if contrary to the only reasonable conclusion.**

On review of the trial court's findings of fact, the question is, not whether some testimony could be culled from the record which might support the finding, or whether the finding was so against the weight and preponderance of the evidence as to be clearly wrong, but whether, considering the entire body of evidence as a whole, a conclusion could be reasonably drawn from it which would support the finding.

Pleasants, C. J., dissenting.

Error from Galveston County Court; Geo. E. Mann, Judge.

Action by Steve Petrovich against the Palatine Insurance Company, Limited, of London, England. Judgment for plaintiff, and defendant brings error. Reversed, and judgment rendered for defendant.

Williams & Neethe, of Galveston, and Locke & Locke, of Dallas, for plaintiff in error.

---

McDonald & Wayman and C. G. Dibrell, all of Galveston, for defendant in error.

GRAVES, J. This was a suit to recover on a tornado policy for the alleged destruction in the storm of August, 1915, at Galveston, of a building occupied by the plaintiff as a dwelling. The company defended on the ground that the loss or damage resulted from causes excepted from the policy, which provided that the company should not be liable for any loss or damage occasioned directly or indirectly by any tidal wave, high water, overflow, or cloudburst, or for any loss or damage caused by water or rain, whether driven by wind or not, unless the building insured should first sustain an actual damage to the roof or walls of same by the direct force of the wind, and that the company should then be liable only for such damage to the interior as might be caused by water or rain entering through openings first made by the direct action of the wind.

The case was tried before the court, and resulted in a judgment for the plaintiff for $1,000, the amount of the policy, with interest from date of judgment, and costs of suit. The defendant filed a motion for new trial, which having been overruled, this writ of error was properly sued out, and assignments of error duly filed.

The court, at the request of the defendant, filed findings of fact and conclusions of law; the material ones, for the purposes of this opinion, being as follows:

"(b) While said policy was in full force and effect, on the 16th and 17th days of August, A. D. 1915, as a direct result of a tornado, windstorm, and cyclone of terrific violence, the insured property was totally demolished, destroyed, blown away, and was a total loss to plaintiff."

"(d) * * * I specially find that east wall of the house was blown out at time wind reached its highest velocity, and immediately after this wall was blown out the rest of the house went to pieces in the hurricane and by it."

"(f) The loss and damage suffered by plaintiff does not come within any of the exceptions in the policy relieving defendant from liability; and in this connection I find that the loss and damage was not due directly or indirectly to high water or a tidal wave."

The promise of the company, as printed on the face of the policy, is, so far as material, as follows:

"The Palatine Insurance Company, Limited, of London, England, * * * does insure Steve Petrovich * * * against all direct loss or damage by tornado, windstorm, or cyclone, except as hereinafter provided, to an amount not exceeding one thousand dollars in the following described property. * * * The policy is made and accepted * *. * subject to the following stipulations and conditions printed on back hereof, which are hereby specially referred to and made a part of this policy."

On the back of the policy are provisions as follows:

"This company shall not be liable for any loss or damage caused by hail, whether driven by wind or not. * * * nor for loss or damage occasioned directly or indirectly by or through any * * * tidal wave, high water, overflow, cloudburst. * * * This company shall not be liable for any loss or damage caused by water or rain, whether driven by wind or not, unless the building insured, or containing the property insured, shall first sustain an actual damage to the roof or walls of same by the direct force of the wind, and shall then be liable only for such damage to the interior of the building or the insured property therein as may be caused by water or rain entering the building through openings in the roof or walls made by the direct action of the wind."

The exception referred to in the last paragraph in the preceding quotation from the policy is inapplicable. The suit in the present case was not for damage to the interior of the insured dwelling, but for the total loss of the same; the whole structure having been demolished, and the ground left bare.

There are only two assignments presented; the first challenging the correctness of the trial court's judgment on the ground that the loss sustained was not covered by the terms and provisions of the policy, but was expressly excepted out of them, and the second on the ground that the evidence was insufficient to support the court's finding that the destruction of the property, and the consequent loss, was caused by the direct action of the wind alone, and was not caused or occasioned directly or indirectly by high water or a tidal wave.

[1] We think the contentions under both assignments must be upheld, and that the policy by its terms was essentially and plainly a wind damage policy. In making the contract with the insured therein contained it was very evidently intended by the insurance company not to insure him against the very kind of a loss he here sustained; that is, one caused either directly or indirectly by water.

Without refining upon the degree of causation by the high water necessary, we think it is sufficient to say that, to our minds, it is quite clear that the water was at least a contributing cause of the loss suffered, and that is enough, under our interpretation of the contract of insurance as made, to bring it within the exceptions. The obligation, as undertaken by the insurance company, was not a divisible one, under which it might be held liable for any part of the loss or damage shown to have been proximately caused by or through the high water, although the other part was due to the direct action of the wind alone. If such had been the legal effect of the contract, it would have been necessary for the court and jury to distinguish between these two recoverable elements

of damage, and, however difficult it may have proven, to both find and apportion to each its proper and proportionate amount of the actual loss. Warmcastle v. Scottish U. & N. Ins. Co., 201 Pa. 302, 50 Atl. 941.

But the contract here does not so read. It is an insurance against wind alone, and not against loss occasioned partly by wind and partly by high water. The physical conditions surrounding the property at the time, which both parties must be held to have had in contemplation in making the contract, leave no doubt of their intention to except from the policy just such a loss as the present one.

Galveston Island, on which the insured building stood, has no lakes, streams, or rivulets. The building itself was on dry land, several feet above the sea level, and entirely secure, save in extraordinary winds, from water damage. The exceptions in this wind damage policy could have had reference only to the water damage occurring during, or as a result of, such extraordinary winds. Without further discussion, we quote with approval, as applying the principle ruling our stated conclusion in this case, from the opinion in National Fire Ins. Co. v. Crutchfield, 160 Ky. 802, 170 S. W. 187, L. R. A. 1915B, 1094, by the Kentucky Court of Appeals, involving the construction of a tornado policy practically identical in its provisions with those of the policy here, as follows:

"It is therefore perfectly apparent that neither the wind, acting independently of the flood, nor the action of the flood, apart from the high wind, would have caused the damage, and the question is: Under the terms of the contract above quoted, were the appellants liable? The contract was to insure appellee 'against all direct loss or damage by tornado, windstorm, or cyclone' except 'for loss or damage occasioned directly or indirectly by or through * * * high water [or] overflow.' Can it be said, under the facts of this case, that the injury was not at least indirectly occasioned by the high water? The evidence is conclusive that, except for the existence of the flood at the time of the windstorm, there would have been no damage. Neither of these agencies, independent of the other, would have produced the damage. The plaintiffs were insured against loss by one of them, and not from loss by the other." National Fire Ins. Co. v. Crutchfield, 160 Ky. 802, 170 S. W. 187, L. R. A. 1917B, 1094; Hartford Fire Ins. Co. v. Nelson, 64 Kan. 115, 67 Pac. 440; Warmcastle v. Scottish U. & N. Ins. Co., 201 Pa. 302, 50 Atl. 941; Maryland Casualty Co. v. Finch (U. S. C. C. A., 8th Ct.) 147 Fed. 388, 77 C. C. A. 566, 8 L. R. A. (N. S.) 308; Stover v. Insurance Co., 3 Phila. (Pa.) 38; Beakes v. Insurance Co., 143 N. Y. 402, 38 N. E. 453, 26 L. R. A. 267; Holmes v. Insurance Co., 98 Fed. 240, 39 C. C. A. 45, 47 L. R. A. 308.

With the policy construed, as we have thus concluded it must be, we think the further conclusion is irresistible from the evidence that the loss was, within the meaning of these exceptions, occasioned directly or indirectly by or through the high water. It is deemed unnecessary to detail the evidence, or to do more than state its salient and controlling features, as follows:

[2] The defendant in error's house was located at 5410 K street in the city of Galveston. The section of the city in which the house stood had originally been a low, wet, marshy section, with a slough running through it. Some three or four years before the August, 1915, storm, this section had been filled in by pumping sand into the low area and erecting or building up what is commonly known as "made" ground. The ground on which defendant in error's house stood was between 4 and 8 feet above sea level. The house stood on a 25-foot lot, and it had a width of 24 feet and a length of 38 feet. The house had four rooms and a hall, with a small porch built in under the roof on the southeast corner of the house. K street extends east and west, and defendant in error's house stood on the north side of this street, facing south. The house had as a foundation No. 6x6 posts, and stood from 6 to 8 feet off the ground. It was braced by "tongue and groove" baseboards, which formed a basement under the house without openings, save doors at the front and rear. The floor of the house had an elevation of 6 to 8 feet above the ground. It is not disclosed by the evidence whether the posts went down into the ground or sat on top of the ground. The sea wall ended at Fifty-First street, according to the testimony of one witness, and at Fifty-Third street, according to the testimony of another.

There was but one eyewitness to the destruction of the house, J. Jernigan, who lived next door, but who spent the night in the house in question, was in it throughout the storm and until it collapsed, and he was thrown into the water. During the storm, the water first came southward from the bay, filling all low places, surrounding the house, and flowing by with an ever-increasing velocity. The witness Jernigan described it as of such force that it washed away his fence, even before he went over to the plaintiff's house at about 6 or 7 o'clock in the evening. The water then, as nearly as Jernigan could recall, was waist deep on the ground. It continued to rise from that time until the house collapsed at between 1 and 2 o'clock on the following morning. In the meantime it had risen to such a height in the house that Jernigan had to place a large chest on the bed to keep it from floating away, and later this chest began to float with him, and it became necessary for him to swim or wade to the transom, where the water rose as high as his neck. While hanging from the transom, several minutes before the collapse of

the house, the house began to "rock like a cradle," as if it was off its foundation. Jernigan had observed from plaintiff's house at earlier hours in the night four or five houses, situated directly across the street from plaintiff's house, drift toward the Gulf in the rising waters. Jernigan estimated the depth of the water, at the time it reached its highest point, so far as he was able to observe, as 12 feet; but other witnesses put it at only 6 or 7 feet.

When the sun rose upon the waters the next day, not a house for a distance of 200 or 300 yards was left standing. Not one pole of the foundation of defendant in error's house remained. The ground adjoining was washed away to a depth of 4 or 5 feet, and in its place was a big pond of water. Some few of Jernigan's statements were:

"In my opinion, from my observation and the conditions as I saw them there then, this house of Steve Petrovich's would have stood, but for the water. If there had not been any water there, I believe the house would have stood; no water at all, the house would have stood. You might say it was a new house and strong." "I first began to notice the rocking sensation which I have described a few minutes before the house went to pieces; that is, the trembling. The rocking was after I got to the transom, and that was a very few minutes before it went to pieces. I don't know whether the house was on its foundation at the time I felt the rocking. I don't hardly think it was at the time it was rocking, because the water came up way past my waist." "As to whether there was anything being blown by the wind prior to the destruction of Petrovich's house, such as signs and other débris, I didn't see any débris. * * * I noticed nothing blown about until the destruction of that house." "As to whether the statement that the wind and water carried this house away was largely a guess on my part; will say it went away, and it had plenty of wind and water both. Yes; it went away when the wind was at its highest." "If it hadn't been any water on the island, I think the house would have stood the wind, because other houses stood in lots of places where it was high and dry; old houses, older than it is; houses 20 years old."

The mere opinion of this sole eyewitness, given by him both ways, as to whether it was the wind or the water that caused the destruction of the house sinks into unimportance as against the overwhelming weight of the array of facts he states, showing that it was the combined effect of both elements. Indeed, these facts demonstrate that his seemingly paradoxical opinion was really correct; and this court, after the most painstaking examination of the entire testimony, is compelled to agree with him, and to hold that, under the policy as we have construed it, reasonable minds could have reached no other conclusion.

From these conclusions, it necessarily follows that the judgment of the trial court must be reversed, and judgment here rendered for plaintiff in error; and it is so ordered. Railway Co. v. Rowell, 45 S. W. 763; Railway Co. v. Holland, 27 Tex. Civ. App. 397, 66 S. W. 68; Railway Co. v. Lee, 32 Tex. Civ. App. 23, 74 S. W. 345: Cartwright v. Canode, 106 Tex. 502, 171 S. W. 696; Flynn v. Radford Co., 174 S. W. 902; Gonzales v. Adoue, 56 S. W. 543–548; Choate v. Railway Co., 90 Tex. 82, 36 S. W. 247, 37 S. W. 319; Lumber Co. v. Railway Co., 164 S. W. 402; B. Ass'n v. Wolfshohl, 155 S. W. 644, bottom of page 647; Railway Co. v. Moses, 144 S. W. 1037; Flores v. Railway Co., 24 Tex. Civ. App. 328, 66 S. W. 709.

The case has been admirably briefed and presented upon both sides, and expression of appreciation is here made to counsel.

Reversed and rendered.

## On Motion for Rehearing.

The motion for rehearing in this case was held up to await a construction by the Supreme Court in a companion case of the insurance contract sued upon. That court has since delivered its opinion, sustaining this court's original holding that the policy here evidenced an insurance against wind alone, and not against loss occasioned partly by wind and partly by high water. Coyle v. Palatine Insurance Co., 222 S. W. 973. If, therefore, under the facts appearing; the loss sustained by the appellee was to any extent due to the water, the insurance company was not liable. This issue, despite the trial court's finding to the contrary, was likewise formerly determined in this court adversely to the appellee, and the judgment in his favor was reversed and rendered.

The statement of facts has been again carefully examined, and we are still unable to arrive at any other conclusion than that —irrespectively of the burden of proof, which, under the Supreme Court's opinion in the Coyle Case, was upon appellee—the water was plainly shown to have been a concurring or contributing cause of the destruction of the house. In deference to the appellee's earnest contention upon rehearing, although not couched in as considerate language as is usual with his able counsel, we now set out much of the testimony which before was only briefly digested. What are thought to be practically all the material portions of the eyewitness Jernigan's long statement are as follows:

"I know Steve Petrovich well, lived next door to him. He lived on the west side of me on the same block, adjoining lots. I lived on K, and that street extends east and west. I lived on the north side of K, facing south. My house faced south. Going out from town on K, you would come to my house first, before that of Mr. Petrovich. I was at home all day of August 16, 1916. It was raining in the morning.

On the night of the storm I was in Frederick's house. By Frederick I mean Petrovich. I lived as a neighbor to him about 32 months. * * * The first I heard of an approaching storm was Monday, August 16th; Monday morning. I heard there was a storm approaching. I never paid any attention to the news. I did not go down to work that morning, because it was raining. As to the storm, I didn't pay any attention to it at all. My family stayed with me until about 11 o'clock. Then they came up town, and went, I believe, to the schoolhouse, to the West Broadway schoolhouse. I remained there. Between 11 a. m. and 4 o'clock that afternoon, I spent the time at home. I stayed at home until I suppose about half past 6 or 7 o'clock. I never noticed the time, but I suppose until then. I then went over to Steve's house. As to the condition out there at that time, the water was pouring through there fast and it washed away my house. Steve's house where I went, that is the house next door to me; that is, Steve Petrovich's. The water was up about waist deep when I went over to his house. I thought maybe his house was stronger than mine. I thought that, because it was squarer and a little larger than mine. His house was built. I heard him say, about 9 or 10 months before mine was. The water was about waist deep when I went over there. I do not remember just the time the water began to pour in fast. I imagine about 4 or 5 o'clock when the water first began to come in, but I am not sure. That is my best recollection. It came from the northeast, but the water poured in from the bay, from the north, and the wind seemed to be from the northeast. The water was coming from the direction of the bay; that is, from the north. The wind at that time seemed to me like was from the northeast. I don't know where it first developed from; in fact, never paid much attention to the wind until the water began to pour in, and then I seen what we was up against. When I went over to Petrovich's house, I went to bed and went to sleep. I got into the window; raised the window. I went into the southeast room and went to bed. That was one of the front rooms, fronted on the gallery.

"As to whether I went around the house and saw about the doors, well, I went in and looked out the kitchen window several times, to see if my house was still standing. I did not close all the doors. The south door I left open, after I seen the water was coming in, filling up so fast. I left the south door open, because the wind was coming in at the north door, and if I left that door open there would have been too much wind in the house. I left the south door open. I left that door open, so the water could go in through the house and not float the house off. I thought maybe that would help some. I always heard of people cutting holes in the floor to keep the house from floating off; so .I left the door open, to see if that would help. I don't know how long I stayed in bed. I went to sleep. I waked up, was waked up by the two cows in the basement bellowing and bumping their horns against the floor, and I jumped up then and ran to the window to look out, and ran all around, looking out of the windows, and I seen the houses across the street had floated off about 300 yards. Those were the houses directly across the street, facing this house, facing the north. I don't know what time it was the first time I noticed it. I cannot fix approximately the time I got out of bed. The first time I got up and noticed the storm, I don't remember what time it was. I looked at the clock, but the clock was not running. I suppose they had let it run down. It was an old clock and it was not running. Water came up into the house, but I don't know how long it was after that, I went back to the bed again after the water had come in, and I laid down and I believe took a little nap again. When I waked up the second time, the water was coming in at the door, the south door, and coming into the room, and all over the floors. I got up again, water was ankle deep, looked out of the window, saw my house still standing, watched my house more than anything else; it was still standing. I did not know just what time it was; the clock was not running and I did not have a watch. During the time I was in the house there, I observed the houses across the street. I observed them about three times, different times, I believe. I looked out to see if they were still standing. I noticed they were floating away across the beach, nearly out of sight.

"As to what I was doing in the house during this time, will say I went to bed and went to sleep. I was waked by the cows bumping their horns against the floor and beams, and I looked all around, looked at all of the houses, looked at everything, and went back to bed, and taken another little nap. The water had not begun to come into the house at that time—just high enough that the cattle swimming in the basement were bumping their horns— and I went to sleep and had another nap, and there was no bumping then, and the water was beginning to come in the south door. I got up, took another look around, and I went back to bed again; fixed myself down and said I just as well take another sleep. I did not undress. I had on my pants and shirt was all; had my shoes off. I laid down lengthwise of the bed. The next time I waked up the water was coming in the house strong; it was coming in the second time I waked up, and the next time it was coming up pretty close to the bed, and I got up and got an old chest that was floating around in the room, and I got that and set that up in the bed and sat down, and directly the water began coming in the bed. I got that chest, because I seen the water was going to come up in the bed where I was at, and I wanted to stay up out of the water and make it dry—see. The chest was used for clothing; her clothing, or the children's clothing, I suppose. When I had put that chest across the bed, I set down on it. Stayed there I suppose about 10 minutes, and the water began to float the chest, and I couldn't stay on it. It was going out from under me, and then I couldn't stay up out of the water, and then all at once I felt the house begin to tremble, and I either swam or waded to the front door, and unlocked the transom, and brought it up, and caught hold of it, helped myself out of the water, and then I thought the wind was changed to the front; the window was up just a little, and I could feel the wind coming up swift, and the wind was whistling like ev-

erything, and I heard the house crash, like lightning hit it or something. Before that, at the time I went over to the transom, I believe the water must have been about waist deep in the house. I didn't pay much attention, and I don't remember just how, whether I swam or waded to the transom. In feet, I would say at the very least 4½ feet of water about the floor in the house, when the chest wouldn't stay on the bed any more, for the water coming up around it, and I made for the transom.

"As to whether or not, at or prior to the time I went over to the transom, as I have testified, the house had given any motion, will say the house was beginning to give a little then, trembling like, after I got hold of the transom. After I got to the transom was the first time, and I noticed the house rocked, and then it began to rock like a ship in a storm, or like a cradle almost. At that time I was hanging on the transom, then, in the door. I was hanging there with one hand; sometimes had both, and sometimes turned one of them loose; and the water was coming up to my chest then. By that time it must have been 5½ feet in the house, for a door is generally 6 feet, and I was hanging above the door, and the transom was just above the door, small transom. It was before that time that I noticed the house across the street. I never saw any house after I went to the transom; the wind had changed then. As to how long before this it was before the wind changed, will say that I had taken a nap in between them times, and I don't know just how long. Yes; I saw the houses across the street as they began to move. I saw them after they had drifted away. The first time I looked out, I don't know for sure that they had drifted any then; but the second time they had drifted off west, and the third time they had drifted about 300 yards. The first time that I observed that they had drifted any, they were then about 300 yards towards the beach from their old foundations—that is, south. They were all pretty much the same distance that they were, and didn't seem to be turned up, just barely enough water to float them, just enough wind to drive them along gradually, slowly. I saw four or five of them, they all drifted, but the storehouse. I could see four or five plainly. The storehouse stood as long as I was there. Had a lot of groceries in it I suppose held it to its position. It went, but as long as I stayed it was there. My house, Steve's house, and Mike's house stayed. The sea wall goes I believe to Fifty-First street. Mine and Steve Petrovich's house were beyond the sea wall, further out than the sea wall extends. * * *

"When I first noticed the water coming in from the bay, it came in like a current, almost like a stream of water, like you have seen currents. That was about when I first noticed it coming over the shell road from the bay, coming swift, coming in on, and just kept filling it up. The waves were not very high until the wind changed; never was very high. As soon as the wind changed from the northeast, it just poured in on us like a stream; the water just poured in like a stream, not such high waves. After I went in the house and shut up the north doors, I didn't notice the waves. If there were any high waves, I didn't notice them. I had never been through a storm in Galveston prior to that. * * * I don't know how long it was I stayed at the door over the transom; just from a guess, I must have been there 10 or 15 minutes. I just hung there until the wind crashed the end of the house in with me; it went down with me, and went to pieces. The south wall of the house parted from the corner, along the east wall of the house; parted from the corner towards my house, and washed out. That was an awful current between my house and his, and that wall washed out altogether. I hung there a minute or two after that wall went to pieces, with the water then right up to about my neck about that time, and then another puff of wind and the end of it went to pieces; all of it then went to pieces, I suppose, and knocked me plumb to the ground, and I hit the ground hard, and I got up and took a couple of steps in the water to keep from coming up. I was afraid I would come up underneath the house and drown, and when I came up there was no house. I came up clear of the house and I swam off. Yes; there was a current between my house and Steve's. The distance between the two houses was between 3 and 4 feet. * * * When I first came up, I saw nothing but water. I kept swimming, to try to keep from drowning. I did not observe Petrovich's house then. I did not see anything of it after I came up. I don't suppose it was there. I didn't see anything, only water. I didn't see my own house. After I came up, I didn't see any more houses. Did not see my own house after I was thrown out. After the house went to pieces with me, I didn't see anything more. The storm was so terrible then you couldn't see anything, and the wind was blowing. That was when the wind changed, you know, when blowing about 120 miles an hour; that is the weather man's report.

"The last time I saw my house, before the house went to pieces, must have been an hour or more. I laid down after the water began coming over the floor and took another nap. The last time I saw my house it was turned around like, kinder sizzled around. That was sometime before I was out in the water. * * * There was four of the houses in the neighborhood standing up to the time that I told you; some few minutes or half hour, or maybe an hour, I don't know which it was, before the house finally broke to pieces with me. Those four were Mike Lucase's house, mine, Petrovich's, and Dorsey's store. I suppose they remained standing. They were standing the last time I seen them. I suppose they stayed until this wind changed and the waves came over them. I don't know whether they weathered the storm. They were gone after the storm was over. I don't know just when they went. They might have went the same time his did, or a little afterwards. I believe, though, my house stood a few minutes after his did; a little longer than the one I was in. Yes; I believe mine did. When I was hanging like I told you, my house was turning around, sort of sizzling around, but it was upright in its place. When I came up, I swam to keep from drowning. I had to swim in the direction from the wind; couldn't get any

breath towards the wind at all. There were not any waves at that time. I remember the water was calm for a few minutes, and then the waves began to come from towards the Gulf side. It must have been four or five minutes when they did begin to come from that direction, because when I got hold of something— I was about drowned, and I finally got hold of an old wreckage of some kind. I got on that, and the waves would knock me off, and keep going higher, and knocking me off strong; that is, hitting the old wreckage stronger and stronger, and finally knocked the old wreckage all to pieces. That was after Petrovich's house was gone all to pieces. The water got higher than—well, really, I have never been at sea; but I have seen waves in the Gulf during a storm blowing, and waves here in the bay, and from what I judge just like waves in the sea came rolling clean over, even clean over the box cars out there, hitting the box cars, and looked to me like the door next to the north had blowed in. I floated over there, first on one and then another; got knocked off by a piece of wreckage; got on another, or swam until something else came along, and got hold of it, and drifted clear up to the west railroad yards. * * * During the time I was going over there, looked like the waves were coming 5 or 6 feet high. * * *

"I have stated that I opened the south door for the purpose of letting the water in to keep the house from floating. The water had come into the house prior to the time the wind changed to the south. The water was I believe up to the bed before the wind changed. After the wind changed, the house never lasted. I don't think it was over four or five minutes, and that was when I was hanging there over the door. After I got the chest and put it on the bed, I did not at any time go into any of the other rooms of the house. It wasn't but a very few minutes then before the water came up, and I got to the transom; wasn't long. I would say 20 minutes maybe. I didn't know how long it was, but for a guess. In my opinion, from my observation and the conditions as I saw them there then, this house of Steve Petrovich's would have stood, but for the water. If there had not been any water there, I believe the house would have stood —no water at all, the house would have stood. You might say it was a new house and strong. I know it was built about 2½ years ago. I don't know just the way it was built, but everything seemed to be new and all right, and the property had not been filled in but 3 or 4 years, to the best of my knowledge. I wouldn't know how long, but just 3 or 4 years ago that property was filled in. I don't know for sure whether, at the time I went over to the transom, the house was still on its foundation, but I believe it was. It began to tremble, but I don't hardly think it left its foundation, because my house, the last time I looked at it before the storm became so bad, I could see my house right by it, you know, and my house was right by it, like it was, unless they both drifted, which I don't think was probable. I think probably they were in the same place. * * * The basement had been filled in with sand, and he had a baseboard on the outside of his wall—that is, along the line of his lot and his baseboard of his house, basement board came down plumb to the ground, and I don't know whether those posts went down in the ground, or set on top of the ground. I don't know. * * * I first began to notice the rocking sensation which I have described a few minutes before the house went to pieces; that is, the trembling. The rocking was after I got to the transom, and that was a very few minutes before it went to pieces. I don't know whether the house was on its foundation at the time I felt the rocking. I don't hardly think it was at the time it was rocking, because the water came up way past my waist. * * *

"When I went down in the water, as I have described, I believe the depth of the water on the outside from the ground was 12 feet, more or less. I never measured it, you know. I don't know exactly. I believe that is the nearest estimate I can make of it; that it was 12 feet. After the storm, and after my experience that night, I later went back out to the site of mine and Petrovich's houses several times. As to conditions as I found them there then, will say that makes me think of a house that was standing there I had forgot all about. It was just built a few days before the storm on the west side of Steve's house. I had forgotten that house; it was built while I was at work. It was there, where that house stood, that was Mr. Edmundson's house; it was not standing after the storm, but the ground washed away where it stood, 4 or 5 feet deep, I suppose, a big pond of water there. That was adjoining Petrovich's lot. There wasn't anything to see there; everything swept away around my house and around where I lived. Well, I don't know whether you would call it the effect of the waves, or what it is; everything was gone. There was not any house that remained standing within 200 or 300 yards of our house.

"As to whether I know what became of Petrovich's house, will say, I seen part of it lying over here, and mine, too, on an old cotton platform, on the bay shore, I could just see the slate-colored weather boarding right next to my house, and some of the roof and what looked like one of his old chairs, and what looked like a piece of the old chest I was sitting on and the whole end of my house; natural, just like it stood, not turned up at all. All the end floated off together, and the north end of the house, that was the south end, stayed all together, the north end was pretty much together, over on an old cotton platform. I don't know how far that is from where Petrovich and I lived. There is no street running across to judge from. I can give a guess. I guess it was about a mile. Where they are now is 200 or 300 yards from the bay. That is almost north, a little west of north, from mine and Petrovich's house. * * *

"As to whether there was anything being blown by the wind prior to the destruction of Petrovich's house, such as signs and other débris, I didn't see any débris; not anything that way. I know none of the doors were blown open, nor window lights blown out. I say that I noticed nothing blown about until the destruction of that house. I judge from the weather man's report that the wind blew from the east or northeast like until 1:30 or 2 o'clock; don't know what time. Then it changed to the south.

The hardest wind came from the south. The other wind didn't amount to much. It was shortly after the change that was had our hardest wind, and that is the time Petrovich's house went down; the time the crash came was a few minutes after the wind changed. I think that was the hardest part of the wind, when his house went down. I have heard since that the Weather Bureau said that the highest velocity was 120 miles an hour, and I believe it blowed it, too, and a little bit better. * * * As to whether the foundation went with the house, will say there is none of it left there, everything was cleared away. There was no foundation there. The foundation must have went down with the house. I hardly think that, if the house had gone off the foundation prior to the time it went down, that it would have fallen several feet, as the water was coming up around the house in a position that would hold the house from falling. I don't think there would have been much of a fall. * * * As to whether the house had floated any before it went down in the crash, will say that I don't know whether it was on the block at this time or not. I don't know for sure whether it was on the blocks or not. Probably it were, but I don't know, and probably it was not. I felt the house rocking after I got to the transom. The house was not listed at all, sitting straight up until it went down; standing straight up as near as I could tell. The east wall, between my house and Steve's, was the one that went away when this wind changed and it got to this high velocity. Then immediately following that the rest of the house went down, and I found myself in the water. * * *

"As to whether there were any very high waves before the wind changed, will say, when it was light, I never noticed very high waves before the wind changed; but water was coming in from towards the bay. There was a current coming in. I don't think there were any waves to amount to anything. I had the north door shut to keep the wind out, and I never noticed whether the waves ran high before the wind changed or not; but I don't think they were high before the wind changed. I stated that for a few minutes immediately following the change in the wind the water got calm. I suppose that it was during that period that the house went down. I don't know whether the waves was high while the house was going down or not; but they was not high while I was in the water there for a few minutes. * * * As to whether the statement that the wind and water carried this house away was largely guess on my part, will say it went away and it had plenty of wind and water both. Yes; it went away when the wind was at its highest.

"Q. It would be a guess on your part, then, to say what carried it way, wouldn't it? A. Well, the water, of course, the wreckage, of course, drifted away with the water.

"Q. But you would naturally say, would you not, that it went down with the wind, because it was at its highest point? The highest point of the wind? A. Yes; that is my honest opinion, that it was the wind.

"Q. Water could not wash the wall off the house, could it, or cause that house to crash down as you have stated it did? A. Not alone; no. I don't think there was much waves before that change; in fact, I don't think much waves at all. More of a current it seemed, rush of water, before the wind changed. The current was awful strong. It washed our fence away before it got near as high as the fence. The fence was knocked down by the current. * * * I stated a while ago that, when I went across to the transom, the water was about waist deep, and just before the house went to pieces with me altogether it got way up near here (chest). I don't know how long I hung by the transom. I will say between 10 and 20 minutes. I don't know how long it was. From the time I went over to the transom until I was thrown out in the water, the water came on up until away long here (indicating his neck), and I began to think I would drown in the house. I don't know whether its depth between those times had increased as much as a foot. It came up, though, until I had to stand pretty high to keep my head up, as high as I could. * * * You know I answered awhile ago—I said, if it had not been any water at all, the house would have stood on account of being nearly a new house, strong and newly built, and if it hadn't been any water on the island, I think the house would have stood the wind, because other houses stood in lots of places where it was high and dry, old houses, older than it is, houses 20 years old."

The record fails to disclose any attack upon this witness or any material contradiction of his testimony. Only two others, Tussup and Jansen, attempted to give any of the conditions prevailing at the time, and neither of them was nearer Petrovich's house during the storm than 26 blocks. Our original summary of the main facts was in part based upon their testimony; indeed, only in a few noncontrolling details could there be said to be any discrepancy between either of them and Jernigan; for instance, Jansen said he thought Petrovich's house was about one block inside the seawall, and both he and Tussup put the tide in that vicinity at about 12 feet; Petrovich's house was about 6 feet above mean low tide, and the water surrounded it therefore at about 6 feet in depth. Both further said the wind blew harder and stronger than it did in 1900, and did damage to buildings in Galveston, one of them estimating its velocity at about 115 to 120 miles per hour. Petrovich himself, however, placed the ground where his house stood at only about 4 feet above sea level.

If these just mentioned could be said to be, there are no other substantial differences between these witnesses and Jernigan, and they fall far short of either impeaching or undermining his recital. He was present through it all; they were nearly 2 miles away.

[3] The precise question under consideration is neither whether there could be culled from the record some testimony which might support the trial court's finding that the loss was in no wise due to the high water, nor whether that finding was so against the weight and preponderance of the evidence as to be clearly wrong, but whether, considering

the entire body of evidence as a whole, any other conclusion could be reasonably drawn from it than that the water did directly or indirectly concur with the wind in destroying the house.

Under a finding that no other conclusion could be so arrived at, this court, on first submission, by a full bench, decreed a rendition of the judgment entered below. On rehearing the majority have adhered to that conclusion, one member dissenting. So long as there was a question whether, in legal effect, the contract bound the insurance company for a loss resulting in any wise from the action of the high water, we were unwilling to finally determine the cause against the appellee, but with that issue settled adversely to him, we are still unable on this record to hold otherwise than that the water was undisputedly shown to have contributed to his loss. There is, further, under the peculiar condition presented, no reasonable probability that the evidence would be different upon another trial.

Pursuant to these conclusions, the motion for rehearing has been overruled, with CHIEF JUSTICE PLEASANTS dissenting.

Overruled.

PLEASANTS, C. J. (dissenting). I am unable to agree with the majority of this court in the conclusion that there is no evidence in the record to support the finding of the trial court that the destruction of appellee's house was caused alone by the wind. The court below found that the house was "totally demolished, destroyed, and blown away, as a direct result of a tornado, windstorm, and cyclone of terrific violence," and specifically found that—

"the east wall of the house was blown out at the time the wind reached its highest velocity, and immediately after this wall was blown out the rest of the house went to pieces, * * * and that the loss and damage was not due directly or indirectly to high water or a tidal wave."

If there is any evidence in the record to support these findings, this court is not authorized to render a judgment contrary thereto, it matters not how clearly they may appear to us to be against the weight and preponderance of the evidence. The remarkable story told by the witness Jernigan, which is set out at length in the opinion of the majority, contains contradictory statements as to the cause of the destruction of appellee's house, and it was the peculiar province of the trial court to determine from his testimony and that of the other witnesses in the case which of these statements was true. He gives us a very vivid description of the force and fury of that portion of the storm which he observed during the intervals between the various naps which he took after going into the house and before he was washed out of

his bed by the rising waters, and his statements of the circumstances in which the house went down are clear and uncontradictory. After stating that there were no high waves before the house went down, he says:

"I don't know how long it was I stayed at the door over the transom; just from a guess, I must have been there 10 or 15 minutes. I just hung there until the wind crashed the end of the house in with me; it went down with me and went to pieces. The south wall of the house parted from the corner, along the east wall of the house; parted from the corner towards my house and washed out."

He says further:

"The hardest wind came from the south. The other wind didn't amount to much. It was shortly after the change that was had our hardest wind, and that is the time Petrovich's house went down; the time the crash came was a few minutes after the wind changed. I think that was the hardest part of the wind when his house went down. I have heard since that the Weather Bureau said the highest velocity was 120 miles an hour, and I believe it blowed it, too, and a little bit better. * * * As to whether the foundation went with the house, will say, there is none of it left there; everything was cleared away, there was no foundation there. The foundation must have went down with the house. I hardly think that, if the house had gone off the foundation prior to the time it went down, that it would have fallen several feet, as the water was coming up around the house in a position that would hold the house from falling. I don't think there would have been much of a fall. * * * As to whether the house had floated any before it went down in the crash, will say I don't know whether it was on the blocks at this time or not. I don't know for sure whether it was on the blocks or not. Probably it were, but I don't know, and probably it was not. I felt the house rocking after I got to the transom. The house was not listed at all, sitting straight up until it went down; standing straight up as near as I could tell. The east wall, between my house and Steve's, was the one that went away when this wind changed and it got to this high velocity. Then immediately following that the rest of the house went down and I found myself in the water."

When asked on cross-examination to again describe how the east wall of the house went out, he answered:

"Well, just a crying and howling wind, and if there was any waves I could not see it, because I was protected by the house, and I did not think the waves got high yet; anyway they was not when I was in the water (after the house went down). Just a puff of wind, and a crash, and the wall was gone, and I could see my house."

Other testimony in the record abundantly established the velocity and destructive force of the wind at the time the house was destroyed. The preponderance of the testimony showing the height of the tide during the

storm, the elevation of the ground on which the house stood, and the elevation of the house above the ground, fully justified the trial court in rejecting the testimony of the witness Jernigan in regard to the height of the water in and around the house at the time it went down, and shows that the water could not have been within 2 feet of the floor of the house.

There is no evidence that the foundation of the house was undermined. If such had been the fact, it could have been easily established by the condition immediately after the storm of the ground on which the house stood, and if the water was a proximate cause of the destruction of the house, it must have been high enough to have washed it off its foundation. If the trial judge rejected Jernigan's statement as to the height of the water in and around the house, as he had a perfect right to do under the testimony of the other witnesses, how can it be said that reasonable minds cannot differ in the conclusion that the water was a proximate cause of the destruction of the house? It seems to me that both of the opinions of the majority of the court filed in this case ignore the rule, which is fundamental in our judicial system, that where there is evidence to support a verdict or a fact finding of a trial court, an appellate court has no authority to render a contrary judgment.

It is the duty of an appellate court to "cull" from the record all of the evidence tending to support the finding of the trial court, and if the record, when so "culled," presents evidence sufficient even to raise an issue, no judgment can legally be rendered in the appellate court contrary to the fact findings of the lower court. I think the evidence in this record is more than sufficient to raise an issue as to the cause of the destruction of appellee's house, and therefore I cannot assent to the conclusion of the majority that judgment should be here rendered for appellant.