This is a suit by Joseph F. Ebert, the plaintiff, and against Pacific National Fire Insurance Company, the defendant, to recover the sum of $1,000, the face value of a policy of windstorm insurance.
The defendant answered denying that the loss was caused by a peril covered by the policy.
There was judgment below dismissing plaintiff's suit and he has prosecuted this appeal.
The plaintiff alleged that his camp, located on the South side of Highway 90 between Chef Menteur and the Rigolets, was damaged by the hurricane of September 19, 1947, to the extent of $1,135, and that under his policy of extended coverage, he is entitled to recover the face value thereof or $1,000.
The defendant contends that the damage to the building was not a direct loss by windstorm within the meaning of the policy, but, on the contrary, was caused directly or indirectly by tidal wave, high water or overflow which accompanied the hurricane of September 19, 1947. In support of this contention it relies upon the following provisions of the policy: —
"In consideration of the premium for this coverage shown in face of policy, and subject to provisions and stipulations (hereinafter referred to as provisions) herein and in the policy to which this extended coverage is attached, including riders and endorsements thereon, the coverage of this policy is extended to include direct loss by windstorm * * *."
"* * * * * *
"Provisions Applicable Only to Windstorm and Hail: This Company shall not be liable for loss caused directly or indirectly by (a) frost or cold weather or (b) snow storm, tidal wave, high water or overflow, whether driven by wind or not.
"This Company shall not be liable for loss to the interior of the building or the insured property therein caused, (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building insured or containing the property insured shall first sustain an actual loss to roof or walls by the direct force of wind or hail and then shall be liable for loss to the interior of the building or the insured property therein as may be caused by rain, snow, or dust entering the building through openings in the roof or walls by direct action of wind or hail or (b) by water from sprinkling equipment or other piping, unless such equipment or piping be damaged as a direct result of wind or hail."
A careful analysis of the transcript indicates that the only question involved here is one of fact, and that is whether plaintiff's house was blown or floated off of its foundation.
The insured's building was located one hundred and sixty to one hundred and seventy feet from the South side of U.S. Highway 90, and twelve hundred feet from Lake Catherine, in the area between the Rigolets and Chef Menteur, in the Parish of Orleans. Lake Catherine is South of the Highway and beyond Lake Catherine is Lake Borgne and the Gulf of Mexico. North of the highway is Lake Pontchartrain. The Rigolets is the East pass from Lake Pontchartrain to Lake Borgne and Chef Menteur is the West pass. The building was, therefore, practically surrounded by water and, for an additional orientation was approximately one mile from the Rigolets. It is an ordinary three room frame structure, colloquially designated as a "camp". It was built by the plaintiff himself about eighteen years before the hurricane, on a mound of earth about five feet higher than the surrounding marshland on pilings five feet above the ground, which were driven eighteen inches in the ground. The overall measurements of the camp were approximately fifty to fifty-five feet in length by twelve feet in width with nine and one half foot ceilings. It was constructed *Page 42 
of one by twelve vertical boards covered with roofing felt and had a corrugated iron roof. When the camp was closed it was adequately protected from the wind and rain.
We take judicial notice of the fact that the hurricane of September 19, 1947, was of unusual severity. According to the official record of the United States Weather Bureau, which we have examined in the record, the wind attained a velocity of approximately ninety-eight miles per hour in the New Orleans area. The camp, which we have described hereinabove, is situated in open marshland and we conclude that it is a reasonable assumption that the wind was of the same or greater intensity there than in the City of New Orleans.
Two witnesses testified at the trial who were in the area during the hurricane, namely, L. J. Rule, for the plaintiff, who resided at the Rigolets, and Dave Heilbron, for the defendant, who resided in a place known as Green's Ditch and situated approximately three miles from the insured camp in the general direction of Chef Menteur. Both these witnesses rode out the storm in their respective localities.
Heilbron, who is seventy-five years of age and five feet two inches tall, lived at Green's Ditch in a camp located about seventy-five feet from Lake Catherine and about one hundred and fifty feet from Highway 90. He testified that he abandoned his camp at about 1 o'clock on the morning of the hurricane and took refuge in a neighboring camp, occupied by Mr. and Mrs. Phynics which was located about twenty-five feet nearer the highway. Heilbron said that he remained at the Phynics' camp until 8 o'clock in the morning when, according to the record the storm had reached its greatest intensity, he and the Phynics, whom Heilbron described as "old folks" left and walked through the marsh, which was inundated with about four feet of water, to the highway, where he remained throughout the storm, taking refuge under some pilings measuring twelve by twelve. He testified that the wind tore the camps to pieces, hurling lumber, tin and miscellaneous articles across the highway and endangering his life. This is evidenced by the following testimony:
"Q. Then you went to the highway, and you said you sat behind a bunch of pilings, didn't you? A. Yes, big pilings, 12 x 12.
"Q. And you were sitting northward from these — on the lea side in other words, from the pilings? A. I was under them. The pilings was this way, slanted, and I was under them, dodging lumber and flying tin and all like that.
"Q. What did you say you were dodging? A. Timber and tin and everything was hitting on top of the highway; it was hitting on top of them pilings I was under and bouncing on the opposite side.
"Q. What was causing those things to fly in the air? A. That was the hurricane, that terrible wind. It knocked me down a couple of times before I made it under that piling. I had to crawl to get up under there.
"Q. You mean the wind knocked you down as you were going to the highway? A. Yes. I scrambled back to get to that piling there and it knocked me down and I had to crawl to get to them pilings.
"Q. And that was the force of the wind that was doing that? A. The force of the wind knocked me down.
"Q. Now, Mr. Heilbron, you testified about tin and debris flying through the air. Where was it coming from — from what structures? A. Oh, I couldn't tell you what structures it was coming from.
"Q. Well, I mean, it was coming from camps, wasn't it? A. Coming from camps. I don't know which camp it was. I couldn't say. But the things was coming that way and I says: 'Well, a life is a life', and I started to save myself."
William L. Case, an engineer, who testified on behalf of the defendant, fixed the elevation of the Ebert camp, with respect to the elevation at Green's Ditch at about one foot, four inches above sea level. It will be recalled that Ebert's camp was built on a mound of earth which Mr. Case testified as being elevated four feet, ten inches above sea level and about five feet higher than the surrounding marshland, *Page 43 
and the Ebert camp was further elevated by five foot pilings.
The testimony of defendant's witness Heilbron is in conformity, on vital facts, with the testimony of plaintiff's witness, Rule. Rule, a fisherman by occupation, resided at the Rigolets. He abandoned his camp about 2 o'clock on the morning of the hurricane and took refuge with other residents of that area in a building known as Maucele's Bar. He testified that he observed his camp blown down about ten minutes after eight that morning, which was before the water rose.
"Q. Where were you during the hurricane? A. Well, I was right at Maucele's barroom. That is right off from my place at Fort Pike.
"Q. At the Rigolets? A. At the Rigolets, yes sir. That is what they call it. They used to call it the Little Rigolets.
"Q. Did you own a camp at the Rigolets? A. Yes, sir.
"Q. What happened to that camp when the storm struck?
* * * * * *
"A. The camp went down, and it went to wreck and when the water came up, it blowed it away. As the water came up, it washed the wreckage of it away.
"Q. I want to know whether the wind blew your camp down or whether the water knocked it down.
* * * * * *
"Q. Now, what camp were you in? Where were you, what building were you in when this hurricane struck? A. When my camp went down?
"The Court:
"Yes.
"A. I was in Maucele's place, looking at my camp, watching all the time to see whether it would go down or not, and I saw it when it went down.
"Q. How far is your camp from Maucele's place? A. 350 feet, or 400 — not further than 400.
"Q. You testified that you were looking at your camp when it went down. Did the wind blow it down or did the water knock it down?
* * * * * *
"A. The wind blew it down, sir.
"Q. Well, now, when your camp went down, had the water risen at the Rigolets in the area of your camp? A. Well, they had a little water — not so much as we have in a regular high tide.The water wasn't on the road from my camp up to the highway.
"Q. Well, was there any water in your camp at that time?
* * * * * *
"A. No, sir.
"Q. About what time of day was that? A. My camp went down at exactly ten minutes after eight in the morning by the clock there.
* * * * * *
"Q. Now, you testified that you were at Maucele's place. Why were you there? A. Well, I was there because I figured mine was going down. I felt it was going and I wanted to get out before it did go down, and that seemed to be the most likely place to get out of the weather.
* * * * * *
"Q. Now, why did you go to Maucele's camp? A. To get out of the weather. I couldn't stay in mine. I was afraid it was going to fall on me. It was shaking there; it was a small camp.
"Q. Well, was Maucele's building a stronger building than your camp? A. Yes, sir; it is there yet.
"Q. It didn't go down? A. It didn't go down, no.
"Q. Now, how far, measured by air line, is Mr. Ebert's camp from your camp, approximately? A. Well, about nine-tenths of a mile.
"Q. Well, now, was your camp on the same side of the highway as Mr. Ebert's? A. Yes, sir.
"Q. Now, was your camp built in the marsh like Mr. Ebert's? A. Mine was in the marsh; Mr. Ebert's was up on a hill. It was in the marsh on a hill; mine wasn't. *Page 44 
"Q. Well, now, is there any difference in the elevation of the marsh at your camp and the elevation of the marsh in the area of Mr. Ebert's camp?
* * * * * *
"A. Well, the elevation of the marsh is no higher, but the hill pumped up there when the dredgeboat was there raised the elevation where his house was.
"Q. Were there any other camps located near your camp at the Rigolets? A. Yes, sir.
"Q. Now, did any of these other camps — I am not speaking of Mr. Ebert's camp, but the other camps at the Rigolets — blow down?
* * * * * *
"A. Yes, sir.
"Q. Well, now Mr. Rule, about how many camps at the Rigolets were blown down by the wind before the high water came?
* * * * * *
"A. Well, there were four camps right in the immediate neighborhood around mine that went down, besides mine.
"Q. Well, now, did those camps go down before the water came — the high water? A. Before the high water came to them. I saw Mrs. Pokorny's place go off the foundation; and I saw Dave Herring's place go off the foundation before the water ever got up to it. He has got a place of business right near the oyster factory there on the gulfcoast road.
* * * * * *
"Q. Did you remain at Maucele's place during the entire storm? A. No, sir. When the signs and stuff started blowing off the place, I hit the highway. I figured we was going to and I wanted to get where nothing was going to fall on me; so I walked down the side of the highway, which I couldn't walk on the highway, so I walked on up a piece of the way towards where Mr. Ebert's camp was.
"Q. Now, you testified that you took to the highway. A. Yes, sir.
"Q. What did you mean by that? A. Well, I figured it was safer on the highway than staying in that building.
"Q. About how high above the level of the marsh was thathighway? A. Well, right at that particular point, I will say itwas 2 1/2 feet above the highest part of the water, the highestit came there, right there at Maucele's place." (Italics ours.)
Rule testified further that at about 9:30 that morning he became frightened that Maucele's bar, in which he had taken refuge, would be destroyed by the storm, so he left this structure and walked out on the highway. The record reflects that Heilbron, defendant's witness, had taken refuge on the same highway and was still there at 8:45 a.m., so, at this time, the highway could not have been under water. Rule further stated that on the highway he had a clear view of Ebert's camp across the open marsh and that it was then off its foundation and this was before the water rose. When asked by the Court "whether the water had risen in the area of Mr. Ebert's camp," Rule replied, "I will say up as far as the top of the hill where his foundation was, yes."
The evidence reflects that the front of the Ebert camp received the greatest damage. The camp faced north and the hurricane wind struck from the Northeast. The flood waters came from the opposite direction, that is from the general direction of the South or Lake Catherine. The defendant insurance company took photographs of all parts of the camp with the exception of the front. The insurance adjuster testified that the reason he did not take pictures of the front of the camp was that he ran out of film.
Heilbron, a man seventy-five years of age and five feet, two inches tall, accompanied by "old folks" (Mr. and Mrs. Phynics) walked through the marsh to the highway at Green's Ditch at about 8 o'clock on the morning of the hurricane. He testified that the water in the marsh was up to his shoulders, therefore, the water could not have been very rough nor more than four to four and one half feet deep. He took refuge on the highway behind some piling and there was no water on the highway at that time. Rule testified that he walked to the highway at *Page 45 
about 9:30 that morning and the insured's camp was off of its foundation at that time and the water had risen to about the level of the mound of earth in which the pilings supporting the camp were driven. It will be remembered that Heilbron and Rule were the only witnesses produced at the trial who testified that they were in this area during the hurricane.
We have examined the entire record and after a careful analysis of the testimony, we are of the opinion that the evidence preponderates in favor of the plaintiff and is to the effect that the direct cause of the damage to plaintiff's camp was the intensity of the wind on the morning of September 19, 1947.
Counsel for defendant maintain that the damage to the insured's property would not have occurred except for the action of the flood water reaching the property before it had been removed from its foundation by the wind and, in support of this contention cite what they term the leading cases on this subject, which are, of course, Texas cases growing out of the Galveston Hurricane of 1915, to wit: Palatine Insurance Company v. Petrovich, Tex.Civ.App., 235 S.W. 929 and Palatine Insurance Company v. Coyle, Tex.Civ. App., 196 S.W. 560, affirmed by the Supreme Court of Texas in 222 S.W. 973.
In the two cited cases the conditions of the wind and the heighth of the water during the course of the hurricane are vividly and picturesquely described in the opinions. In each instance the appellate court rendered judgment in favor of the defendant insurer on the ground that the exception in the policy clearly indicated that the insurer undertook to insure against loss by wind alone and not loss as a result of the action of wind and water. In each opinion the court stated that the plaintiff bore the burden of proving that his loss was the result of the wind and not caused directly or indirectly by the water.
However, in Pennsylvania Fire Insurance Company v. Sikes,197 Okla. 137, 168 P.2d 1016, 1017 166 A.L.R. 375, a case decided by the Supreme Court of Oklahoma in 1946, which, in our opinion is analogous to the case which we are presently considering, it was held:
"The policy covering the household effects contains the following: 'This company shall not be liable for any loss or damage caused by snowstorm, blizzard, frost or cold weather; * * * nor for loss or damage occasioned directly or indirectly by or through any explosion, tidal wave, high water, overflow, cloudburst, theft; nor for any loss or damage, caused by water or rain, whether driven by wind or not, unless the building insured, or containing the property insured, shall first sustain an actual damage to the roof or walls by the direct force of the wind, and shall then be liable only for such damage to the interior of the building or the insured property therein, as may be caused by water or rain entering the building through openings in the roof or walls made by the direct action of the wind, or by water from sprinkler or other piping broken by such damage to roof or walls.'
* * * * * *
"Defendant says that by virtue of the above quoted provisions of the policies it is not liable for water damage under the facts here. Citing Coyle v. Palatine Ins. Co., Tex.Com.App., 222 S.W. 973; Newark Trust Co. v. Agricultural Ins. Co., 3 Cir., 237 F. 788; Palatine Ins. Co. v. Petrovich, Tex.Civ.App.,235 S.W. 929; Parish v. County Fire Ins. Co., 134 Neb. 563, 279 N.W. 170, 126 A.L.R. 703; and National Fire Insurance Co. v. Crutchfield, 160 Ky. 802, 170 S.W. 187, L.R.A. 1915B, 1094. Those are cases wherein the trier of facts found that the damage was caused by flood, or there was no sufficient evidence upon which to base a conclusion that the wind alone was the proximate cause of the damage. The cases would be applicable had the jury here found that the house was removed from its foundations and carried away by the rising flood waters. The jury herein found to the contrary. The Texas cases concern losses occasioned by tidal waves — where great bodies of gulf waters were blown into and against the houses and they were in fact inundated and flooded thereby where they stood upon their foundations. In Coyle case it is pointed out that the policy excepted from its coverage damage caused by action of water driven by the wind. Here that damage *Page 46 
which may have occurred to plaintiff's property after it had been deposited in the flood waters by the wind was not caused by water driven by the wind. Much the same may be said of the other cited cases. They contain some showing that the damage would not have occurred but for the action of the flood waters reaching the property itself before it had been displaced by action of the wind. They merely hold that the proximate and efficient cause of the damage was by flood as commonly known and accepted, and as agreed upon in the contracts of the parties. Here the wind directly damaged the property and was alone the proximate and efficient cause of the same being deposited in the flood waters where it likely was damaged further. We think it would be far-fetched to reason that the parties to these contracts would have contemplated such damage to be a flood damage. We have the view that the exceptions above noted in the policies relate to flood damage as commonly known.
"In the cited cases the facts were that flood waters were the proximate cause rather than the contributing or incidental cause of the disturbance of the houses, or was a major factor with the wind in making up the initial cause, or agency, which caused the houses to be disturbed and removed from their anchorage. Therein there was flood damage as the proximate cause of the damage as contemplated by the contracting parties. The houses were in fact flooded by bodies of water which flood water caused or was an efficient element in the cause of the entire disturbance of the houses.
"In the present case neither the house nor the truck was affected by the flood water until the wind had blown them from their sites and anchorage. Whatever flood damage may have resulted thereafter was incidental, and a somewhat logical sequence to the wind disturbance. No unusual or unexpected thing occurred thereafter to cause the water damage. Common experience and understanding suggest that when personal property of this nature is blown into a body of water that some water damage will likely result before the property can be recovered.
"It is fair to assume that under these facts this incidental water damage was within the terms of the policies and contracts of the parties at the time they were made."
In our opinion the instant case is distinguished from the case cited by the defendant by the Sikes case, and we feel that the distinction is clear, unequivocal and appropriate and that, in this case, our conclusion of fact is supported by sound reason and equity.
The description of the situs of the insured's camp readily conveys the associated idea that the camp is surrounded by water, and it is inconceivable to us, who have lived all of our lives in this general area, to believe that a storm or hurricane could occur of any sort whatsoever, without a corresponding rise in the tide. There is not one scintilla of evidence in the record of a tidal wave — where great bodies of gulf waters were blown into and against the camps causing them to be inundated and swept away by the mad fury of gargantuan waves of water. The damage to the insured's camp, in our opinion, was not occasioned by the action of flood waters, in the common and accepted sense of that phrase, reaching the property itself before it had been displaced by the intense action of the wind. Here the wind directly damaged the property and was alone the proximate and efficient cause of the camp being deposited in the water. If a tornado or windstorm policy does not afford protection from a storm accompanied by winds of ninety-eight miles per hour or more, it occurs to us that authors of the contracts of windstorm insurance may just as well insert a clause in the policy to the effect that it should not be operative when a hurricane is accompanied by high tides.
As stated the vital issue of fact in this case was whether the plaintiff's camp was blown or floated off of its foundation and we have concluded and found as a fact that the camp was blown into the flood waters by the intense force of the winds prevailing in that area at the time of the hurricane.
We said in Owens v. Felder, La. App., 35 So.2d 671, 672, that: "We are reluctant *Page 47 
to reverse the finding of a trial court based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occasionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of the transcribed record with other pertinent portions than it is to accurately observe and catalogue them while listening to the oral evidence of the various witnesses who testified during the course of the trial."
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of Joseph F. Ebert, the plaintiff, and against Pacific National Fire Insurance Company, defendant, in the full sum of $1,000, together with legal interest from judicial demand until paid, and for all costs.
Reversed.